HALL (NELSON v.). See Case No. 10,107.

HALL (OFFUT v.). See Case No. 10,447.

HALL (OFFUTT v.). See Cases Nos. 10,449 and 10,450.

HALL (O'HARRA v.). See Case No. 10,468.

---

## Case No. 5,941.

HALL v. The PAQUET BOT DE CAYENNE.

[27 Leg. Int. (1870) 364;[1] 7 Phila. 550.]

Circuit Court, D. Delaware.

SALVAGE—COMPENSATION—DERELICT.

[1. The old rule or usage giving to salvors one-half the value of the property saved in cases of derelict is no longer in force; and the amount is to be determined, in the sound discretion of the court, upon the same considerations as in other cases, except that the fact of the property being derelict makes out a prima facie case of extreme danger of total loss, and thus enhances the reward.]

[2. Where a schooner, without special risk or danger, or unusual expenditure of skill, picked up and towed in a derelict bark found near the mouth of Delaware Bay and drifting toward the shoals with the tide, but under a reasonable probability of being again carried to sea, before she struck, by the adverse tide, where she would in all probability have been saved by some of the numerous passing vessels, an allowance of $1,500 salvage on a valuation of $9,570.90, after payment of all costs and expenses, is a reasonable amount, and the award of one-half the valuation by the district court was excessive.]

Appeal from the district court of the United States for the district of Delaware.

[In admiralty. Libel by Hall and others, being the owner, master, and crew of the schooner Joseph P. Comegys, against the derelict barque Paquet Bot de Cayenne, Bordeaux, to recover salvage. The district court allowed the salvors one-half the value of the derelict, and the claimants and underwriters appealed therefrom. Modified.]

T. F. Bayard and James Gray, for salvors.

Henry Flanders, for owners and underwriters.

STRONG, Circuit Justice. That the libellants are entitled to salvage is plain, and indeed it is not controverted. The only question for my consideration, is what sum should be awarded, and this I must determine without the aid of any fixed rule, and in view of the circumstances of the case. It is doubtless true that salvage service is considered by courts of admiralty as eminently merito-

[1] [Reprinted from 27 Leg. Int. 364, by permission.]

rious. In determining to what reward a salvor is entitled, he is never treated as a mere creditor for work and labor done. From a regard for public policy, and to encourage brave and humane efforts to save property at hazard on the seas, the long-settled practice has been to make allowances for salvage services much beyond the intrinsic value of the services themselves. Other things are considered, and enter into the estimate of the fitting allowance. Thus the value of the property saved; the degree of danger for (from) which it has been rescued; the hazard to the lives or property of the salvors incurred in their efforts to save; reasonable apprehensions of danger to life or property; the skill and labor put forth, and the duration of the service, are all proper subjects to be weighed in fixing the amount which should be decreed. In view of all these things, and with regard to the circumstances of each case, a sound discretion is to be exercised, and care taken that while the allowance made shall be liberal, it shall also be reasonable; that while the salvors shall be compensated for their labor, and encouraged by reward for their heroism and humanity, they shall not be allowed to profit inordinately from the misfortunes of others. Such an adjustment is to be sought for in all cases. It was undoubtedly, at one time, if not a rule, at least an usage, to give to salvors one-half the value of the property saved, when that property was derelict, or had been abandoned; and many cases have been decided on that principle. But I regard it as settled now, both in this country and in England, that the extent of the reward is to be measured in derelict cases as in all others. I will not go over the cases. It is sufficient to refer to The Florence, 20 Eng. Law & Eq. 607, and Post v. Jones, 19 How. [60 U. S.] 150. In the former of these cases, Dr. Lushington said "that the reward in derelict cases should be governed by the same principles as other salvage cases,—namely, danger to property, value, risk of life, skill, labor, and duration of service." He added "that no valid reason can be assigned for fixing a reward for salving derelict property at a moiety, or any given proportion, and that the true principle is adequate reward according to the circumstances of the case." With this the supreme court of the United States concurred in Post v. Jones [supra]. The doctrine appears to me to be eminently reasonable and just. I have said danger is one of the reasons why salvage is allowed, and that it is measured in part by the degree of danger. There often is as much danger of total loss of a vessel not abandoned, as there is of total loss of a derelict, and there is as much hazard to the salvors in the rescue of one as in salving the other. It is not easy to see why the reward, so far as it is enhanced by considerations of the danger, should not be computed in the same way. Similar remarks may be made respecting every consideration that en-

ters into fixing the amount of salvage. I agree that always it is an important inquiry whether the property saved was a derelict, if for no other reason than this, that, if it was, there is a prima facie case of extreme danger; but still the circumstances of the case are to be considered. There are very different degrees of danger of final loss to the owner in case of derelict. A vessel abandoned in a land-locked harbor is more likely to be recovered by the owners than one abandoned in mid-ocean, or on a rocky and stormy coast. Drifting ashore is a means of safety to some species of property, while to others it is certain destruction. How can salvage in these cases be equally meritorious, or how can its value be determined by a fixed rule applicable to them all alike?

The facts of this case, as they are exhibited by the pleadings and proof, are easily understood. The libellants are the owner (and) the master and crew of the schooner Joseph P. Comegys. On Sunday, the 17th of September last, on her way from Boston to her port in the Delaware, when she was approaching the mouth of Delaware Bay, and was about twenty-five miles from the New Jersey coast, the barque Paquet Bot de Cayenne, Bordeaux was seen by her master about ten miles distant, and between the schooner and the coast. This was about nine o'clock in the morning. The wind was blowing a wholesale breeze from east-northeast, and a considerable sea was running. The wind and the sea had been so heavy the night before that the schooner was compelled to lay to, but on Sunday morning the wind moderated, though continuing to blow a stiff breeze. Something in the position or movements of the barque attracted the attention of the master of the schooner. His testimony is that he "thought she was not in the position she ought to be; that is, she was in an unusual position for a square-rigged vessel; that a vessel drawing a big draught of water never goes in where she was; and that because he thought her in danger he approached her." The schooner reached the barque about ten o'clock in the forenoon, when she was found to be entirely abandoned. Her main-sail, main-top sail, fore-sail, and lower fore-top-sail were set. Two stay sails had also been set, but they were principally blown away. The port side of the upper fore-top-sail was started. Her bowsprit was gone, and, with the hear-gear attached to it, was hanging under her port bow, dragging in the water (the head-gear being held by chains and ropes). The mate of the schooner and one seaman were put on board. The evidence is, that at this time she was headed towards the great shoals, off the Capes, then about eight miles distant, over which the sea was breaking; that she was moving about two or two and a half miles an hour, and that if she had gone upon the shoals she must have been broken up. After the mate and seamen went on board it was found that the barque had little water in

her, and that she would obey her helm. An attempt was made by the schooner to tow her so as to avoid the shoals, but the towing line broke. She was, however, gradually worked in some ten miles from the place where she was picked up, and anchored in six fathoms water about four miles from the Delaware breakwater. This was at three o'clock in the afternoon. A signal was then set on the schooner for a tug, and about six o'clock in the evening the tug America came out. After some negotiation, a bargain was made with the tug to tow the schooner and barque up to quarantine for five hundred dollars. The barque was then taken in tow and brought up to New Castle without serious difficulty, the mate and the seaman remaining on board of her. The schooner got under weigh at ten o'clock; and (the wind then blowing heavily north-northwest) put into the breakwater, and was compelled to let go both anchors. Undoubtedly the barque was a derelict when she was boarded by the libellants. Unless picked up by them, or some other vessel, she would inevitably have been totally lost. Whether she would have gone upon the great shoals between the Capes is not clear to my mind. As I have stated, when the mate went on board of her at ten o'clock, the wind was blowing freshly east-northeast. This would have carried her outside the shoals towards the open sea or the Delaware coast. But the tide was running west, and this carried her toward the shoals. The tide continued to flow west until half past two. What the combined effects of the wind and tide would have been is not quite clear. The captain and mate of the schooner express the opinion that she would have drifted on to the shoals, and one of the seamen testifies that if she had held on the course on which she was going when boarded, and had the wind and the tide remained the same, she would have gone ashore had she not received assistance. On the other hand, Captain Marshall, of the pilot boat, Thomas Howard, who saw where the barque was when she was boarded, and who came up to offer assistance, states that there was not time for her to drift onto the shoals before the tide turned, and that as the wind veered to the northward with the change of tide, she must have drifted out to sea. Captain Young and Captain Duncan, both experienced navigators, and well acquainted with the coast and shoals along the Capes, express the same opinion. They, however, judge not from personal observation of the position of the barque, but from the statements made by the other witnesses respecting her position. In either event, whether she would have gone upon the shoals if not assisted, or whether she would have drifted past the shoals and gone out to sea, there was no inconsiderable chance of her rescue without the agency of the Joseph R. Comegys. She was discovered in the morning. She was near the entrance to Delaware Bay, in plain sight of the track follow-

ed by many vessels. Other vessels were passing into and out of the bay during that Sunday. She was without any helmsman, dragging her bowsprit and head-gear in the water, coming up into the wind, shaking a little and falling off. It is fairly to be presumed that her strange movements would have attracted the attention of other vessels than the Comegys, in time to enable them to aid her, before she could have struck the shoals, or drifted entirely out to sea. In fact, she was seen from the pilot-boat Thomas Howard almost as soon as she was discovered by the libellants, and was overhauled by the boat three quarters of an hour afterwards. I cannot but feel, therefore, that though she was a derelict, hers was not a case of the extremest danger. Her situation would have been much more hopeless had she been abandoned in mid-ocean, with little chance of being seen by passing vessels. I am not unmindful of the language of Judge Story in the case of The Henry Ewbank [Case No. 6,376], reiterated in Evans v. The Charles [Id. 4,556]. In speaking of the possibility of the derelict's having been saved without the intervention of the salvors, Judge Story said: "The fact that she was thus saved is clear; the presumption that she might have been otherwise saved * * * is mere matter of conjecture, in nubibus. It is not the habit of any courts of justice to yield themselves up in matters of right to mere conjectures and possibilities; and least of all do courts of admiralty, in cases of salvage, yield themselves to imaginations of this sort. Salvors are not to be driven out of court upon the suggestion that if they had not touched a derelict ship and cargo, the latter might in some possible way, have been saved from all calamity, and therefore, that the salvors have little or no merit." This was said in a case where the derelict was found in mid-ocean, in latitude 40, and longitude 5° 4' W., where she had been drifting about 19 days after her abandonment, and where there was but a very remote possibility of her being seen had the salvors neglected to aid her. I agree that in such a case the chance of rescue by other salvors, was too small to be considered. And I agree that the merit of salvors in rescuing a derelict is not less, because it may happen that a rescue might have been effected without their agency. But if danger of the loss of property is to be considered in determining what reward shall be given to salvors, if the reward should be in any degree proportioned to the danger, it is impossible to hold that it is immaterial whether the derelict be found in an unfrequented neighborhood or in the midst of a fleet surrounded by those who have the power to help, and who are urged to render assistance not only by motives of common humanity, but by the prospect of securing a liberal reward. I must therefore be influenced by what I believe to

be the fact, that there was a very considerable probability the Cayenne would have been saved by some vessel had the schooner of the salvors passed her by. Captain Young gives me, as his opinion, that she was in the usual track of commerce, and that there were certainly seventy-five chances out of an hundred she would have been fallen in with before 12 o'clock that day, though he adds, it is not every captain who picks up a vessel. Derelict, then, as she was, she was not in the extremest danger of destruction. The duration of the service rendered by the salvors was brief, not longer than five hours from the time the Cayenne was boarded until she was anchored; though the Joseph P. Comegys remained by her until six in the afternoon, when the tug took her in tow, and the mate and one seaman went in her from the Capes up to New Castle. The danger incurred by the salvors was slight. Their vessel was worth from sixteen to eighteen thousand dollars, but I cannot discover that she was imperilled, unless putting two men on the barque left her short of hands. And she was very near the breakwater, a place of safety. Nor do I see that there was any extraordinary risk of life, or expenditure of skill and labor, or any well-grounded reason for apprehension by the salvors of danger to themselves or their property.

Entertaining such opinion of the law and of the facts of the case, I am unable to concur with the learned judge of the district court in fixing the sum which should be awarded for salvage. The appraised value of the property saved is $9,570.90. Of this the district court awarded to the libellants a moiety, after first deducting from the entire amount, the costs of the proceedings and all expenses incurred in the seizure and detention of the barque, and in the discharge of the cargo, and in the appraisement of the vessel and cargo; and also all duties imposed by the laws of the United States upon the merchandize composing the cargo. I have the highest respect for the judgment of the judge of the district court, and in a matter resting so much in sound discretion I would not make an award different from his without reasons that I must consider very cogent. But I am thoroughly convinced the sum allowed for salvage was too great. The salvors assumed to pay five hundred dollars to the tug America for towing the barque from the place where she was anchored to quarantine. That sum may properly be considered as expense incurred in effecting the salvage. I think fifteen hundred dollars in addition is a liberal and reasonable allowance. I therefore direct that the costs of the proceedings in this and the district court, including the cost of the appraisement made, be paid out of the money deposited in the registry, and that the sum of two thousand dollars be allowed thereout to the libellants for salvage.